UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

WILLIE DANTZLER,

                 Plaintiff,

and

U.S. DEPT. OF HEALTH AND HUMAN
SERVICES, CENTER FOR MEDICARE
& MEDICAID SERVICES,

                 Involuntary Plaintiff,

         v.                            Case No.  10-C-0675

CITY OF MILWAUKEE, JEFFREY THIELE,
MICHAEL WAWRZYNIAKOWSKI,
and UNITED HEALTH CARE OF WISCONSIN, INC.,

                 Defendants.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION
FOR SUMMARY JUDGMENT (DOC. 20) AND SETTING A STATUS CONFERENCE

      Willie Dantzler brings this action against the City of Milwaukee and two of its police
officers, individually and in their official capacity, as a result of a stop-and-frisk, his arrest,
and his subsequent treatment by police.  The City and the police officers have moved for
summary judgment and as discussed below, that motion will be granted in part and denied
in part.[1]

      Summary judgment is proper if the depositions, documents or electronically stored
information, affidavits or declarations, stipulations, admissions, interrogatory answers or
other materials show that there is no genuine dispute of material fact and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v.*

---

[1]Involuntary plaintiff United States Department of Health and Human Services and defendant United
Health Care, Inc. are alleged to be necessary parties by virtue of their provision of health care coverage to
Dantzler.  They are not involved in the motion for summary judgment.

*Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in his favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

## UNDISPUTED FACTS

A.   Dantzler's Lack of Information or Knowledge

Local rules for this district require parties filing and responding to a summary judgment motion to submit statements of proposed material facts and responses thereto. Civil L.R. 56(b). Civil L.R. 56(b)(2)(B)(I) dictates that a response to a proposed finding of fact, other than an admission, has to include "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon."

2

Uncontroverted statements of proposed facts are deemed admitted for the purpose of the summary judgment motion. Civil L.R. 56(b)(4).

Dantzler responded to many of defendants' statements of proposed material facts with the following: "Plaintiff lacks information or knowledge sufficient to form a belief as to the allegations as Defendants have failed to cooperate in discovery and, therefore, denies the same and puts Plaintiff to its proof thereon." (*See, e.g.*, Pl.'s Resp. to Defs.' Proposed Findings of Fact ("Pl.'s Resp.") ¶ 7.[2]) Generally, when he makes this statement Dantzler provides no citation to evidence supporting his denial. Instead, he rests on the alleged lack of cooperation by defendants as justification for his failure to present contrary evidence.

The court has rejected Dantzler's arguments concerning his alleged inability to obtain facts and has denied his motions to compel, for extension of discovery, and to strike or stay defendants' summary judgment motion. Thus, Dantzler's complaints about defendants' lack of cooperation are not sufficient to deny defendants' proposed findings. Moreover, the parties' discovery dispute was not an impediment to *all* discovery by Dantzler. In his motion to compel, Dantzler contended that defendants failed to respond to: (1) an interrogatory about individuals who may know about the incident though they did not witness it; (2) a document production request for personnel files of the defendant officers; and (3) a document production request for all intake logs or other reports showing how many persons were booked or processed at a particular police station on a certain day. Those three categories did not impact Dantzler's ability to conduct other discovery

_____

[2]Dantzler is stating that he puts himself to his proof. Indeed, summary judgment *is* the time when a plaintiff is put to his proof. However, assuming Dantzler meant to say he was putting *defendants* (rather than himself) to their proof, they did, in fact, present proof with their motion in the form of affidavits from Officers Thiele and Wawrzyniakowski and transcripts under the affidavit of defense counsel. Dantzler needed to meet that proof with contrary proof, not merely state that he lacks any information or knowledge to do so.

3

or respond to the summary judgment motion. For instance, attached to Thiele's affidavit as Appendices JT-2 to JT-6 are copies of photographs of the District 7 garage entryway and the holding area. Dantzler denies that the photographs accurately depict the garage and holding area as they were on the day of the incident. However, he provides no evidence as to inaccuracies and suggests that defendants' failure to cooperate in discovery impeded his ability to deny the accuracy of the photos. But neither the interrogatory nor the document production requests that Dantzler asserted in his motion to compel had anything to do with the description or depiction of the holding area in the District 7 garage. Moreover, it appears nothing stopped Dantzler from viewing the area, from taking photographs or describing the area in his own words. Because Dantzler provides no contrary evidence on the matter, the court accepts the photos as accurate.

Even though Dantzler may not have received the discovery he requested, he could have deposed the officers or conducted other discovery and then sought to redepose the officers if he thought it necessary and he won the discovery motions. Therefore, a statement that he lacks information or knowledge regarding defendants' proposed findings is not sufficient. Any such response fails to rebut the defendants' proposed finding; the court will treat as undisputed each proposed finding to which Dantzler gave this response.

B.      Statement of Undisputed Facts

Willie Dantzler is an adult resident of Milwaukee who at the time of the incident in question was fifty-eight years old. (Pl.'s Proposed Findings of Fact ("PPFOF") ¶¶ 5, 45.) Defendant City of Milwaukee is a municipal corporation existing under the laws of the State of Wisconsin. The City was and is the employer of defendants Jeffrey Thiele and Michael Wawrzyniakowski. (Defs.' Br. in Supp. § III, Proposed Findings of Fact ("DPFOF") ¶ 4;

4

PPFOF ¶ 6.) Thiele and Wawrzyniakowski were at all times relevant to the subject matter of this litigation employed as City of Milwaukee police officers and were acting under color of law, within the scope of their employment. (DPFOF ¶¶ 5-6; PPFOF ¶¶ 7-8.)

On Tuesday, October 24, 2006, at about or just prior to 2:42 p.m., Dantzler was returning home from his daily walk. (*See* PPFOF ¶ 11.) At the same time and location an AT&T utility worker, David Stewart, was on Concordia Street performing maintenance work. (PPFOF ¶ 12; Def.'s Resp. to Pl.'s Proposed Findings of Fact ("Def.'s Resp.") ¶ 12.) His vehicle was parked eastbound. (DPFOF ¶ 9.) Dantzler encountered his neighbor, Louis Smith apparently on the north side of the street. (PPFOF ¶ 13; *see* PPFOF ¶ 17.) Smith, an alcoholic with sclerosis of the liver, was holding a nearly empty bottle of alcohol. (PPFOF ¶¶ 14-15.) Dantzler scolded Smith for drinking, and Smith handed the bottle of alcohol to Dantzler. (PPFOF ¶ 16.) They were approximately twelve feet from where Stewart was performing his utility maintenance work. (PPFOF ¶ 17.) As Dantzler began to walk away from Smith, Thiele and Wawrzyniakowski were approaching southbound in the 3200 block of North 27th Street in their unmarked squad car and plain clothes. (PPFOF ¶ 18; *see* DPFOF ¶ 7, 8, 11.)

Thiele observed an AT&T worker to the east of him on Concordia Street, standing behind his truck, with his back turned toward Thiele. (DPFOF ¶¶ 7, 8.) He observed an African-American male walking eastbound on the north side of West Concordia toward the location where the AT&T worker was parked facing eastbound. (DPFOF ¶ 9.) Also, Thiele observed a tall African-American male subject walking in the middle of West Concordia Street, facing eastbound, toward the AT&T worker. (DPFOF ¶ 10.) It appeared to Thiele

5

that the second male, upon seeing Thiele's car, began walking to the south side of West Concordia Street. (DPFOF ¶ 11.)

The situation did not look right to Thiele; he was concerned for the safety of the AT&T worker, given that two men were approaching the worker from behind and from different locations in the street. (DPFOF ¶ 13.) Based upon Thiele's previous experience as a police officer and due to the location of the two individuals and their route of travel, he thought they may have been attempting to rob the AT&T worker. (DPFOF ¶ 14.)

Upon seeing the police car speeding toward him, Dantzler hurried to cross the street to the south side of Concordia. (DPFOF ¶ 12; Pl.'s Resp. ¶ 12; Lappen Aff. (Doc. 22) Ex. A at 17; *see* DPFOF ¶ 11.) Wawrzyniakowski and Thiele drove up toward the AT&T worker and stopped both of the subjects to investigate Thiele's suspicions. (DPFOF ¶ 15.) The male who had been walking on the north side of Concordia Street, Smith, stopped right away after Wawrzyniakowski and Thiele asked him to stop, and he was cooperative. (DPFOF ¶ 16.)

The other male, Dantzler, had his hands in his pockets. (DPFOF ¶ 17; Thiele Aff. filed 11/15/11 ¶ 12.[3]) Dantzler is 6'3" tall. (DPFOF ¶ 19.) Thiele exited the car and yelled to Dantzler: "Hey, you, stop. I don't like the way you look." (PPFOF ¶ 19; Pl.'s Br. in Opp'n Ex. Tr. at 14; Lappen Aff. filed 11/15/11 Ex. A at 17.[4]) Upon his approach, Thiele showed his badge and gun and identified himself as a police officer. (DPFOF ¶ 18; PPFOF

---

[3]Dantzler objects to this proposed finding and contends that he did not have his hands in his pockets. However, he fails to provide any contrary evidence. He points to page 42 of the hearing before Mr. Fronk at the Police and Fire Commission, but the court has not found that page in the record. The pages of that hearing attached to Dantzler's brief skip from page 25 to page 45, and only pages 1, 2, 3, 7, 19 and 20 are attached as Exhibit C to Attorney Lappen's affidavit filed November 15, 2011. Without any contradicting evidence, the proposed finding and Thiele's statement under oath will be accepted by the court.

[4]Defendants object to this proposed finding but the court must take Dantzler's version as true.

¶ 21.) Dantzler responded: "So what." (PPFOF ¶ 21.) Dantzler took Thiele as having a hostile manner. (*See* PPFOF ¶ 20; Def.'s Resp. ¶ 20.) Thiele screamed at Dantzler and asked him about his and Smith's activities near Stewart. (PPFOF ¶ 20, 21; Pl.'s Br. in Opp'n Ex. Tr. at 14.[5])

Dantzler explained to Thiele that he and Smith were not attempting to rob Stewart, were not involved with Stewart in any way, and that Stewart's presence was a coincidence. (PPFOF ¶ 22.) After another comment by Dantzler, Thiele replied: "Shut up! Don't open your mouth!" (PPFOF ¶ 24; Pl.'s Aff. in Supp. of Compl. (Doc. 2) ¶ 15.)

Thiele asked Stewart if everything was all right and he confirmed that it was and that Smith and Dantzler were not bothering him in any manner. (PPFOF ¶ 25.) Thiele continued his questioning of Dantzler. (PPFOF ¶ 26; Def.'s Resp. ¶ 26.) Dantzler asked Thiele to clarify the problem and, in response, Thiele became hostile and loud. (PPFOF ¶ 27; Pl's Aff. in Supp. of Compl. ¶ 19.)

In accordance with standard procedure, upon making the initial verbal contact with Dantzler to conduct a field interview, Thiele asked him to remove his hands from his pockets, so Thiele could see them. (DPFOF ¶ 20.[6]) It is Thiele's usual procedure to ask to see a subject's hands in the context of a field interview, for the safety of the individual being interviewed and the police officers present. (DPFOF ¶ 21.) Thiele had to order Dantzler to remove his hands from his pockets at least twice before Dantzler complied. (DPFOF ¶ 22.)

---

[5]Thiele says he did not scream but instead spoke in a firm, professional manner (Thiele Suppl. Aff. (Doc. 38) ¶¶ 5, 6), but Dantzler's version must be believed.

[6]Again, Dantzler objects to proposed findings regarding him having his hands in his pockets, but provided no contrary evidence indicating that he did *not* have his hands in his pockets when police arrived.

Thiele decided to pat-down Dantzler's pockets to check for weapons, because (1) he believed that Dantzler may have been attempting to rob the AT&T worker; (2) his prior police experiences taught him that people who commit robberies are often armed with weapons; and (3) Dantzler was not immediately compliant with the order to show his hands, further arousing his concern for safety. (DPFOF ¶ 23.) Thiele instructed Dantzler to raise his arms. (PPFOF ¶ 28.) Dantzler's arms lowered at one point and Thiele used his hands to knock Dantzler's arms or hands upward. (Pl.'s Br. in Opp'n Ex. Tr. at 15-16; DPFOF ¶¶ 30-31.)

Dantzler told Thiele not to rough him up because he was disabled, and Thiele replied "shut up." (Pl.'s Br. in Opp'n Ex. Tr. at 15.) Dantzler protested the questioning and search by Thiele. (PPFOF ¶ 30.) Thiele became "combative" and referred to Dantzler as a "smart ass." (PPFOF ¶ 30.[7])

Thiele patted down or searched Dantzler's pockets and found an unopened can of beer in one and an opened 200 ml bottle of Aristocrat vodka in another. (DPFOF ¶¶ 24, 25; PPFOF ¶ 29.) The vodka bottle was three-quarters or more empty. (DPFOF ¶ 26.) Dantzler has admitted that he possessed the opened bottle of vodka and that at least some of the contents were missing. (DPFOF ¶ 27.)

Thiele told Dantzler he was going to be charged with public drinking or receive a municipal citation for possessing open intoxicants. (PPFOF ¶ 30; Def.'s Resp. 30.) Dantzler asked Thiele if he could smell any alcohol on his breath. (PPFOF ¶ 31.) Thiele

---

[7]Again, Thiele denies telling Dantzler to "shut up" or screaming at Dantzler, and says he instead spoke in a firm, professional manner (Thiele Suppl. Aff. (Doc. 38) ¶¶ 5, 6), but Dantzler's version must be believed.

replied: "Shut up, smart ass!" (PPFOF ¶ 31; Pl.'s Aff. in Supp. of Compl. ¶ 27.) Then, Thiele placed Dantzler under arrest.[8] (PPFOF ¶ 31.)

Thiele handcuffed Dantzler. (DPFOF ¶ 33.) Dantzler informed Thiele that the handcuffs were too tight, pinched his wrists and caused them to bleed. (Pl.'s Br. in Opp'n Ex. Tr. at 17.) Thiele responded: "You all say that." (PPFOF ¶ 33; Pl.'s Br. in Opp'n Ex. Tr. at 17; Lappen Aff. filed 11/15/11 Ex. A at 18.)

Thiele escorted or pulled Dantzler to the squad car by his jacket.[9] (DPFOF ¶ 32; Pl.'s Resp. ¶ 32; Pl.'s Br. in Opp'n Ex. Tr. at 17; Lappen Aff. (Doc. 22) Ex. B at 36-37.) He intended to have Dantzler sit in the squad car while he or Wawrzyniakowski conducted a check through their police console operator to determine if Dantzler had any warrants for arrest. (DPFOF ¶ 34.) Dantzler walked approximately nine feet to the squad car. (DPFOF ¶ 36.)

While the above events were occurring, Wawrzyniakowski was interviewing Smith. (DPFOF ¶ 37.) As the volume between Dantzler and Thiele began to rise, Wawrzyniakowski moved to where Thiele was escorting or pulling Dantzler to the squad car and seating him in it. (DPFOF ¶ 38.)

Dantzler was placed in the rear seat. The officers then contacted their console operator to have her run a wanted check on Dantzler. (DPFOF ¶ 39.) As the officers waited for the console operator to complete the wanted check, Thiele tried to explain to

_____

[8]Dantzler points out that Thiele did not give Dantzler any *Miranda* warning. (PPFOF ¶ 32.) However, that fact is immaterial for present purposes.

[9]Dantzler says Thiele dragged him (*see, e.g.*, Pl.'s Resp. ¶¶ 32, 34), but the evidence does not support any finding that Dantzler was pulled along the ground. Instead, it appears that Thiele pulled Dantzler while Dantzler remained moving his feet, though perhaps stumbling. (*See* Pl.'s Br. in Opp'n Ex. Tr. at 17; Lappen Aff. (Doc. 22) Ex. B at 36-37.) In any event, the method of escort is immaterial, as Dantzler does not argue that any such dragging constituted excessive force.

9

Dantzler that public drinking and the possession of open intoxicants in public was a violation of a municipal ordinance. (DPFOF ¶ 40.) The check on Dantzler showed no outstanding warrants. (PPFOF ¶ 34.)

Next, Thiele decided to convey Dantzler to Milwaukee Police District No. 7 to issue a citation. (DPFOF ¶ 42.) The Milwaukee Police District No. 7 station is approximately eight blocks from the location where Dantzler was taken into custody. (DPFOF ¶ 43.) At the station, Wawrzyniakowski proceeded into the station to conduct other police business. (DPFOF ¶ 55.)

Dantzler was not going to be formally booked or processed. (DPFOF ¶ 44.) Therefore, upon arrival at the station, Thiele did not have him sit in the area for prisoner booking. (DPFOF ¶ 45.) Instead, he had Dantzler sit in a large, overflow holding area, in Milwaukee Police District No. 7, across the garage entryway from the booking area. (DPFOF ¶ 46.) For more than five years, officers have used the overflow area to hold subjects while they write citations. (DPFOF ¶ 77.) The holding area is surrounded by metal mesh, and is approximately 84" high, by 109" wide, by 182" deep. (DPFOF ¶ 48.) Dantzler calls the area a "cage" in the garage (Pl.'s Resp. ¶¶ 45-46; PPFOF ¶ 34), though he admits it was "big" cage[10] (DPFOF ¶ 49.)

---

[10]Again, as discussed above, the court accepts the photos and measurements as accurate. In his Affidavit in Support of Complaint, Dantzler stated that when he was taken to station 3 (not 7) he was placed inside a dog kennel too small to hold a human his size and tethered to a dog leash used to restrain police canines. (Pl.'s Aff. in Supp. of Compl. ¶¶ 28-30, 40.) However, Dantzler backs off from this description in his summary judgment response materials, as he does not deny the dimensions of the mesh cage area or that he was handcuffed to a restraint cable on the bench (rather than tethered to a dog leash) at District 7. (*See, e.g.*, Pl.'s Br. in Opp'n at 8 ("Upon arriving at District Seven, Officer Thiele removed Mr. Dantzler from the squad car and handcuffed him to a wooden bench in a cage located in the garage, known to Defendants as the 'overflow holding area.'"), Pl.'s Br. in Opp'n Ex. Tr. at 20 (indicating he was hooked to a bench with a cable); Pl.'s Resp. ¶ 51.) Further, looking at the photos, no reasonable jury could accept a description of the mesh cage area as a dog kennel or too small to hold a human. Therefore, the court does not find these statements in Dantzler's affidavit to constitute a bar to summary judgment in defendants' favor.

10

Two long church-pew-like benches are located in the holding area, for subjects to use as seating. (DPFOF ¶ 50.) Thiele had Dantzler sit on one of those benches, and attached Dantzler's handcuffs to a restraint cable that was attached to the bench. (DPFOF ¶ 51-52; Pl.'s Resp. ¶ 51-52; PPFOF ¶ 34; Lappen Aff. filed 11/15/11 Ex. B at 56.) Dantzler sat on the bench but could only sit for a couple minutes before being uncomfortable, so he stretched his legs and twisted and turned and changed positions. (Lappen Aff. Ex. C at 20, Ex. B at 56.) Due to the manner in which Dantzler was handcuffed to the bench, his size and physical condition, and the size of the bench, Dantzler was unable to find a comfortable position and had to constantly change positions, including kneeling. (PPFOF ¶ 35.)

While Dantzler sat in the overflow holding area, Thiele sat at a desk nearby and wrote out Dantzler's ticket. (DPFOF ¶ 53.) Dantzler was the only person in the cage while Thiele wrote the ticket; no other subjects were located in the overflow holding area. (DPFOF ¶¶ 57-58.) Only Dantzler and Thiele were in the garage. (DPFOF ¶ 56; Pl.'s Resp. ¶ 56; Lappen Aff. filed 11/15/11 Ex. B at 56.) While Thiele was writing the ticket for Dantzler, he did not observe other prisoners being booked or processed in the booking area, and no other subjects were in the overflow holding area. (DPFOF ¶ 58.) However, Dantzler observed other members of the police department peer inside the door from the station leading to the garage area. (PPFOF ¶ 36; Pl.'s Aff. in Supp. of Compl. ¶ 33.)

Dantzler remained in the mesh overflow area or cage for about forty-five minutes. (PPFOF ¶ 35; *see* DPFOF ¶ 61.) Thereafter, Thiele removed him from the holding area and gave him the citation. (DPFOF ¶ 59.) He released Dantzler from the police garage, with the admonition that he should appear in court at the date and time indicated on the

11

citation if he wanted to challenge it. (DPFOF ¶ 60.) Dantzler sought to enter the station to file a complaint against Thiele, but Thiele prevented him from entering through the garage because of security issues. (PPFOF ¶ 37; Def.'s Resp. ¶ 37.)

Dantzler walked out of the garage and reentered the District 7 station through the front door, where he requested complaint forms but the request was denied by a duty sergeant. (PPFOF ¶ 38.) He inquired at the front desk why he was forced to remain in the cage and was told by the officers that it was the overflow area, that all jail and holding cells were full, and that they had no other place to detain him. (PPFOF ¶ 39.) After another comment by Dantzler about filing a complaint, the duty sergeant handed Dantzler a complaint form. (PPFOF ¶ 40.) Subsequently, Dantzler filed a complaint against the police department at the department's central headquarters. (PPFOF ¶ 41.)

Dantzler did not require or seek any medical treatment for any injury, and he does not have any photographs that depict any injury to his wrists. (DPFOF ¶ 33; Pl.'s Br. in Opp'n Ex. Tr. at 21.) However, he still has a mark where the handcuff pinched his skin. (Pl.'s Br. in Opp'n Ex. Tr. at 17.)

Thiele issued the citation under Milwaukee Municipal Ordinance No. 106-1.8. (DPFOF ¶ 62.) This ordinance provides:

> It shall be unlawful for any person to consume any alcohol beverage or possess on his or her person, any bottle or receptacle containing alcohol beverages if the bottle has been opened, the seal broken or the contents of the bottle or receptacle have been partially removed upon any public alley, highway, pedestrian mall, sidewalk, or street within the limits of the city.

(Thiele Aff. (Doc. 23) Ex. JT-1.)

The citation led to a municipal court trial on February 27, 2007. (DPFOF ¶¶ 63-64; PPFOF ¶ 43.) Dantzler and Thiele testified at the trial. (DPFOF ¶¶ 65-66.) Dantzler

12

represented himself. (DPFOF ¶ 66.) The municipal court judge found Dantzler guilty of violating the subject ordinance, and entered judgment accordingly. (DPFOF ¶ 67.) The judge imposed the minimum penalty amount and permanently stayed enforcement of the penalty. (PPFOF ¶ 44; Pl.'s Resp. ¶ 67; Lappen Aff. filed 11/15/11 at 25-26.) Dantzler did not appeal the judgment of guilt. (DPFOF ¶ 68.)

On March 19, 2009, the Board of Fire and Police Commissioners of the City of Milwaukee found that Thiele violated MPD Rule 4, Section 2/060.00 regarding courtesy and civility by subjecting Dantzler to greater indignity (being transported to the police station and handcuffed to the bench in the holding area) than was necessary to issue the municipal citation. (PPFOF ¶ 42; 1st Am. Compl. Ex. A at 5; Pl's Br. in Opp'n Ex. Tr. at 6.) The Board recorded the violation in Thiele's permanent personnel file but took no additional disciplinary action. (*See* PPFOF ¶ 42; 1st Am. Compl. Ex. A at 6.)

Thiele has been trained by instructors at the Milwaukee Police Training Academy that police officers in the State of Wisconsin may arrest an individual summarily if they have probable cause to believe that a violation of a law has been committed by that person. (DPFOF ¶ 71.) Thiele has been trained that if he personally observed an individual violate the law, he may arrest that individual, even if it is a violation of a municipal ordinance. (DPFOF ¶ 72.) Thiele has also been trained that he may handcuff an arrested individual to promote the safety of the individual, himself, and other officers present. (DPFOF ¶ 73.) Instructors through the Milwaukee Police Training Academy have trained Thiele that he may transport a subject to a nearby police district station for the purpose of writing and issuing a municipal citation. (DPFOF ¶ 74.) Moreover, Thiele has been trained that he may release an arrested subject upon issuing a municipal ordinance citation,

13

without the necessity of formally "booking" the arrested subject. Instructors at the Milwaukee Police Training Academy have trained him that when he engages in the process of issuing a citation he may keep the subject handcuffed and in a safe location. (DPFOF ¶ 76.)

Officers regularly use the overflow booking area located at the District 7 station to hold subjects while they write their citations, and they have done so for more than five years. (DPFOF ¶ 77.)

Wawrzyniakowski did not touch Dantzler on October 24, 2006. (DPFOF ¶ 79.) Aside from speaking with Wawrzyniakowski in the squad car and giving Wawrzyniakowski his name and identifying information, Dantzler had no communication with Wawrzyniakowski that day. (Lappen Aff. filed 11/15/11 Ex. B at 63.) Thiele did not hit, kick or use any weapons against Dantzler during their encounter. (DPFOF ¶ 80.)

### CLAIMS AGAINST THIELE AND WAWRZYNIAKOWSKI IN THEIR INDIVIDUAL CAPACITIES

Dantzler claims that the individual officers violated his civil rights through (1) an unlawful stop-and-frisk; (2) unlawful arrest; and (3) excessive force. In addition, he asserts (4) a state-law claim of intentional infliction of emotional distress.

Officer Wawrzyniakowski contends that no facts support any of these claims against him, and he is correct. The undisputed facts show that Wawrzyniakowski questioned Louis Smith, not Willie Dantzler. Thiele questioned Dantzler, frisked Dantzler, handcuffed Dantzler, placed Dantzler in the backseat of the squad car, took Dantzler to the overflow area, handcuffed Dantzler to the wire or bench, and ticketed Dantzler. Wawrzyniakowski did not touch Dantzler in any way, question him, place him under arrest, secure him in the

14

overflow holding area, or process the citation. Wawrzyniakowski may have walked over to Thiele and Dantzler, participated in the warrant check, accompanied Thiele and Dantzler in the car, and entered the garage with Thiele and Dantzler, but the record before the court shows nothing upon which a reasonable jury could find that Wawrzyniakowski violated Dantzler's rights.

Regardless, Dantzler contends that Wawrzyniakowski was an "accessory" to Thiele's "misdeeds" because he was present. However, a § 1983 plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right, *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Moreover, Dantzler did not bring a claim that Wawrzyniakowski violated Dantzler's rights by failing to intervene or protect him, and the undisputed facts show that Thiele, not Wawrzyniakowski took the actions about which Dantzler complains.

In short, no facts support Dantzler's claims against Wawrzyniakowski and summary judgment must be granted in Wawrzyniakowski's favor.

The court now turns to Dantzler's claims regarding Thiele's actions.

A.      Stop-and-Frisk

Individuals are protected by the Fourth Amendment as they walk down the street. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968). Police have no authority to detain people at will to investigate crime; they need probable cause, reasonable suspicion, or consent. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990). Under *Terry*, police may detain briefly and question an individual to investigate crime, but they must have reasonable suspicion to do so, meaning "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S.

15

at 21.  The facts are judged objectively:  "would the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"  *Id.* at 21-22.  Put another way, a stop is permitted when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot."  *Id.* at 30.  Inarticulate hunches and the officer's good faith are not enough.  *Id.* at 22.

Once an individual is legitimately stopped and if the officer is objectively justified in believing that the individual is armed, the officer may pat down the individual to check for weapons.  *Id.* at 27, 29-30.  However, circumstances in the initial stages of the encounter may dispel that fear.  *See id.* at 30.

Whether an officer has reasonable suspicion is a fact-specific assessment of the totality of circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect.  *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011).  "The time and the location of the stop are also relevant to the reasonable suspicion inquiry."  *Id.*

Here, a reasonable jury could find that Thiele lacked reasonable suspicion to stop and question Dantzler.  As Thiele approached Dantzler he observed that he was walking away from the AT&T worker and Smith, not toward them.  This suggests that Dantzler was not approaching the AT&T worker to rob him.  In general, there is nothing suspicious about people "strolling up and down the street, singly or in pairs."  *Terry*, 392 U.S. at 22-23.  That Dantzler may have had his hands in his pockets, does not necessarily make his walk down the street suspicious.  Moreover, it was the middle of the afternoon.  Thiele provides no evidence that this is a high-crime area or that utility workers had been accosted in the area

16

previously, especially in the daylight. That Dantzler hurried across the street when a car was approaching does not necessarily indicate wrongdoing, either; the officers were in an unmarked car, not a recognizable squad such that flight might be suspicious. Thus, whether a person of reasonable caution would be warranted in the belief that criminal activity was afoot is a jury question.

If Thiele's stop was unconstitutional, the pat-down was as well, so summary judgment must be denied as to the stop and the pat-down. However, nothing prevents Dantzler from arguing at trial that even if the stop was permissible, Thiele did not have a reasonable basis for patting him down. At some point Dantzler removed his hands from his pockets and Stewart told the officers that the situation was fine and that Smith and Dantzler were not bothering him. A reasonable jury could conclude that even if the stop was warranted initially by reasonable suspicion, that suspicion was dispelled and Thiele did not reasonably fear for his safety and the safety of his partner. Thus, Thiele's motion for summary judgment will be denied as to Dantzler's claim regarding the stop-and-frisk.

B.      Arrest

In his First Amended Complaint Dantzler claims that his arrest was unlawful. However, he did not oppose defendants' motion for summary judgment on this claim and thus abandoned it.

Moreover, the existence of probable cause for arrest bars any § 1983 claim for unlawful arrest. *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989); *see* Federal Civil Jury Instructions of the Seventh Circuit 7.05. Dantzler was found guilty of the municipal ordinance violation by the municipal court and that finding still stands. The

17

court's determination that Dantzler was guilty of violating Milwaukee Municipal Ordinance § 106-1.8 means that Thiele had probable cause to arrest Dantzler for that violation.

C.     Excessive Force

Dantzler's excessive force claim is analyzed under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). An officer may use the force reasonably necessary from the perspective of a reasonable officer under the same circumstances. *Id.* at 396; *Deering v. Reich*, 183 F.3d 645, 650 (7th Cir. 1999). Although the totality of circumstances are reviewed, some factors to consider are the need for the use of force and the relationship between that need and the amount of force used, the extent of the plaintiff's injury, efforts made to limit the amount of force, the severity of the crime at issue, the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting arrest or attempting to flee. *See Graham*, 490 U.S. at 396; *Wilson v. Williams*, 83 F.3d 870, 876 (7th Cir. 1996). The reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene, not based on hindsight, and analysis should include allowance for the fact that officers may be required to make split second judgments in rapidly evolving situations. *Graham*, 490 U.S. at 396-97; *Deering*, 183 F.3d at 650. The test is objective, not subjective. *Graham*, 490 U.S. at 397.

Dantzler contends that Thiele used excessive force by arresting him, taking him to the District 7 station for a municipal ordinance ticket, handcuffing him too tightly, and placing him in a cage where he was in discomfort and forced to kneel. He has presented enough evidence to past summary judgment on some parts of this excessive force claim.

The argument that taking Dantzler into custody, handcuffing him, and taking him to the station for processing of the ticket involved the use of excessive force, has some

18

support. The Board of Fire and Police Commissioners, presumably a reasonable body of individuals, found that Thiele subjected Dantzler to greater indignity than was necessary to issue the municipal citation. Viewing the facts in Dantzler's favor, although Dantzler questioned Thiele's actions verbally, Thiele's reactions appear to have been out of proportion. A rising level of confrontation may justify some use of force, *see Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 475-76 (7th Cir. 1997), but it seems the confrontation was escalating more on Thiele's part than Dantzler's. The municipal ordinance violation was a minor infraction and Thiele had already determined that Dantzler had no weapon, thus drawing into question the need for handcuffs and for transporting Dantzler to the station.

However, the Supreme Court decision in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), forecloses the claim. In *Atwater*, the Court held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id.* at 354. The Court found that Atwater's handcuffing, placement in a squad car, transfer to a police station, and placement in a cell for an hour for a seatbelt violation were not an unreasonable seizure; they were "not so extraordinary as to violate the Fourth Amendment." *Id.* at 324, 355. Here, Dantzler had possession of the opened vodka bottle in Thiele's presence, and under *Atwater* Thiele could handcuff him, transport him to the station, and place him in the holding area for forty-five minutes.

Dantzler gets to trial regarding the tightness of the handcuffs. Dantzler says the handcuffs were too tight and he complained to Thiele about it but Thiele did not loosen them. According to Dantzler, he has a permanent mark or scar from the handcuffs. A

19

refusal to loosen chafing handcuffs may constitute excessive force. *See Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1043 (7th Cir. 2002).

But no reasonable jury could find in Dantzler's favor regarding any excessive force claim based on the mere size or condition of the "cage" or length of his detention. The undisputed evidence shows that the area enclosed by wire mesh was seven feet high, more than nine feet wide, and over fifteen feet long—possibly the size of some college dormitory rooms. It was large enough for benches on the sides, and it was located in a larger garage. Also, Dantzler presents no evidence that the door to the mesh area was closed. Hence, no reasonable jury could find that it was objectively unbearable for Dantzler to sit in such an area for about forty-five minutes. Nor could a reasonable jury conclude that a trip to the police station for forty-five minutes is unreasonable. Although Dantzler was receiving a municipal violation ticket rather than going through a formal arrest, no reasonable jury would find that having him sit in the overflow area in a police station which is used while arrestees are booked "exceeded" the amount of force necessary to keep Dantzler under control during preparation of the ticket.

However, Dantzler could sit only for a couple minutes before being uncomfortable. He stretched his legs and twisted and turned and changed positions while detained in the overflow area. Dantzler also says that due to the manner in which he was handcuffed, his size and physical condition, as well as the size of the bench to which he attached Dantzler was uncomfortable, had to kneel at times and constantly change his position. Notably, in *Herzog*, the court recognized a claim based on chafing handcuffs. Here, handcuffing combined with restraint to a bench that may have caused Dantzler to contort his body to avoid discomfort would be more serious than mere chafing handcuffs. Thus, it is possible

20

that a jury could find that Dantzler was subjected to excessive force by being held for forty-five minutes while Thiele issued him a municipal ticket. Therefore, summary judgment will be granted as to Dantzler's claims that excessive force was applied merely because he was detained in the District 7 overflow area and his detention in that area was too long. However, summary judgment will be denied as to Dantzler's claims regarding the tightness of his handcuffs and his positioning while handcuffed to a cable attached to the bench for an extended period of time.

D.    Intentional Infliction of Emotional Distress

Wisconsin Statute § 893.80(1) requires that before bringing a tort action against any municipal officer or employee for acts done in their official capacity or in the course of their employment the claimant must (a) file a notice with the governmental subdivision and its officer or employee within 120 days of the incident, and (b) file a claim with the governmental subdivision's clerk containing the claimant's address and an itemized statement of the relief sought. Failure to give the notice in (a) above does not bar the action if the governmental entity had actual notice of the claim and the failure to provide the notice was not prejudicial. Wis. Stat. § 893.80(1)(a).

Dantzler provides no evidence that he filed any notice or claim with the City or officers. Instead, he argues that the complaint he filed with the police department constituted sufficient notice of the incident. While Dantzler's police department complaint concerning Thiele's actions may have been filed within 120 days (the date is not in the record), thereby satisfying requirement (a) above, he provides no evidence that he filed a claim with the City clerk to satisfy the second requirement. In *Bernardi v. Klein*, 682 F. Supp. 2d 894, 906-07 (W.D. Wis. 2010), Magistrate Judge Crocker found that although a

21

complaint filed with the chief of police gave defendants actual notice of the claim for requirement (a) above, it did not satisfy requirement (b). This court agrees. Thus, summary judgment will be granted as to the intentional infliction of emotional distress claim.

E.    Qualified Immunity

Qualified immunity protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It shields an officer from liability if he or she "reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244. Analysis of an assertion of qualified immunity involves two familiar questions, either of which may be addressed first: (1) whether a constitutional right would have been violated on plaintiff's version of the facts; and (2) whether the right was clearly established. *Pearson*, 555 U.S. at 227, 232, 236; *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Viilo v. Eyre*, 547 F.3d 707, 709-10 (7th Cir. 2008).

To be "clearly established," a right must be specific to the factual context of a cited case and not generalized with respect to the amendment that is the basis of the claim. *Viilo*, 547 F.3d at 710. However, a factual case is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional. *Brokaw v. Mercer County*, 235 F.3d 1000, 1023 (7th Cir. 2000).

As this court has found that a reasonable jury could conclude that constitutional violations of Dantzler's rights may have occurred, the only remaining basis for a finding of

qualified immunity is that the particular rights were not clearly established in October 2006. However, *Terry* stop-and-frisk law was clearly established by then—*Terry*, decided in 1968, is one of the most well-known cases in criminal procedure and sets forth the standard for reasonable suspicion. And the law cited in the excessive force section preceded October 2006, including the case noting that tight handcuffs could constitute excessive force. Thus, summary judgment on qualified immunity grounds must be denied regarding the remaining constitutional claims.

CLAIMS AGAINST THE CITY OF MILWAUKEE
AND THE OFFICERS IN THEIR OFFICIAL CAPACITIES

Claims against the officers in their official capacities are claims against the entity for whom they work. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011). Thus, analysis of the official capacity claims and the claims against the City is the same. Dantzler contends that the City failed to discipline, train or supervise Thiele and Wawrzyniakowski.

Although municipalities are "persons" for purposes of § 1983, liability against them may not arise vicariously; municipalities cannot be held liable under § 1983 on a respondeat superior basis. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978). Instead, they are liable only for acts for which the entity itself is responsible. *Id.* at 690-91, 694. A plaintiff must establish that the municipality acted pursuant to its custom, policy, or practice. *Id.* at 691; *Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011). To establish such a custom, policy, or practice, the plaintiff must show that his injury was caused by (1) enforcement of an express policy of the municipality; (2) a widespread practice so permanent and well settled to constitute a custom or usage with the force of

23

law; or (3) a person with final policymaking authority. *Palka*, 662 F.3d at 434. "Absent proof that the injury in question was caused by an employee with final policymaking authority or by an express policy or established custom of the municipality, there can be no liability on the part of the municipality itself." *Id.*

A single incident, without history, generally provides no basis for inferring a municipal policy. *McKee v. City of Rockwell, Tex.*, 877 F.2d 409, 416 (5th Cir. 1989). Adequately trained officers make mistakes, and those mistakes may result from reasons other than faulty training. *See City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989).

The undisputed facts show that Wawrzyniakowski committed no constitutional violation, so there is nothing on which to base municipal liability relating to Wawrzyniakowski's actions. *See Christensen v. County of Boone, Ill.*, 483 F.3d 454, 465 (7th Cir. 2007) ("Because we have determined that all of plaintiffs' claims under federal law were properly dismissed, there can be no § 1983 liability for Boone County either."). And Dantzler provides no evidence regarding Thiele's training or his supervision. Moreover, Dantzler fails to present proof of an official policy or a custom or policymaker's decision that could have caused or facilitated any of the remaining possible constitutional violations. One officer's action toward Dantzler one afternoon does not establish a municipal policy and there is no suggestion that Thiele was a policymaker.

As for the allegation that the City failed to discipline Thiele, the undisputed facts show the opposite. Thiele received a permanent report in his personnel records. Even if, as Dantzler contends, Thiele was not punished sufficiently for his discourtesy, one

24

disciplinary action does not establish an unlawful pattern or custom of failure to discipline, train or supervise. Thus, Dantzler's § 1983 claims against the City must be dismissed.[11]

CONCLUSION

For the above-stated reasons,

IT IS ORDERED that defendants' motion for summary judgment (Doc. 20) is granted as to all claims against Wawrzyniakowski and the City and granted in part and denied in part as to the claims against Thiele as set forth above. Remaining for trial are Dantzler's stop-and-frisk claim and his excessive force claim regarding his handcuffs and positioning while handcuffed to the bench in the overflow area of the District 7 station.

IT IS FURTHER ORDERED that the a status conference is set for Tuesday, October 30, 2012, in Courtroom 222.

Dated at Milwaukee, Wisconsin, this 30th day of August, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

---

[11]Dantzler's intentional infliction of emotional distress claim is alleged against the individual officers only. Moreover, Wis. Stat. § 893.80(4) bars any lawsuit against the municipal entity for the intentional torts of its officers or employees. *Envirologix Corp. v. City of Waukesha*, 192 Wis. 2d 277, 288-89, 531 N.W.2d 357, 363 (Ct. App. 1995). Thus, the only claims against the City are those under § 1983.

25